## No. 2014-1072

# United States Court of Appeals
# for the Federal Circuit

---

CREATIVE KINGDOMS, LLC AND NEW KINGDOMS, LLC,

*Appellants,*

v.

U.S. INTERNATIONAL TRADE COMMISSION,

*Appellee,*

and

NINTENDO CO., LTD. AND NINTENDO OF AMERICA INC.,

*Intervenors.*

---

On Appeal From the United States International Trade Commission
In Investigation No. 337-TA-770

---

### NON-CONFIDENTIAL BRIEF OF INTERVENORS
### NINTENDO CO., LTD. AND NINTENDO OF AMERICA INC.

---

Stephen R. Smith
Cooley LLP
11951 Freedom Drive
Reston, VA 20190
Tel. (703) 456-8000

Thomas J. Friel, Jr.
Cooley LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Tel. (415) 693-2000

Stephen C. Neal
Timothy S. Teter
Matthew J. Brigham
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
Tel. (650) 843-5000

*Attorneys for Intervenors
Nintendo Co., Ltd. and Nintendo of America Inc.*

# CERTIFICATE OF INTEREST

Counsel for Intervenors Nintendo Co., Ltd. and Nintendo of America Inc. certifies the following:

1.  The full name of every party or *amicus curiae* represented by me is:

    Nintendo Co., Ltd. and Nintendo of America Inc.

2.  The name of the real party in interest (if the parties named in the caption are not the real parties in interest) represented by me is:

    Same as stated in paragraph 1.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

    None.

4.  The names of all law firms and the partners or associates that appeared for the party or *amicus curiae* now represented by me in the trial court or agency or are expected to appear in this Court are:

    Cooley LLP:  Stephen C. Neal, Thomas J. Friel, Jr., Stephen R. Smith, Timothy S. Teter, and Matthew J. Brigham, Christopher Campbell, Ben Damstedt, Laura J. Cunningham, Kevin Lake, Brian Wikner, Robert Spendlove, Matthew Gubiotti, and Jesse Dyer.[1]

---

[1] Brian Wikner, Robert Spendlove, Matthew Gubiotti, and Jesse Dyer are no longer employed by Cooley LLP.

Nixon & Venderhye P.C.:  Robert W. Faris, U.S. "Mickey" Gill, Michael J. Shea, and Joseph Presta.

Dated:  June 27, 2014

Respectfully submitted,

*/s/ Stephen R. Smith*
Stephen R. Smith

*Confidential Material Redacted*

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE ISSUES ........................................................ 1

II.   STATEMENT OF THE CASE ......................................................... 2

III.  STATEMENT OF FACTS ............................................................... 4

    A.    Nintendo ............................................................................ 4

    B.    Creative Kingdoms and its Alleged Domestic Industry ............. 5

    C.    The Patents ........................................................................ 6

          1.    The Patents Describe Mechanical Tilt Switches, Not
                Electronic Sensors ................................................... 7

          2.    Each Switch State of the Wand Corresponds to a
                Preset Command .................................................... 8

          3.    The Patents Do Not Disclose Practicing the Claims
                With Electronic Sensors ............................................ 10

    D.    The Nintendo Wii ............................................................... 11

          1.    The ███████████████ Wii's Operation ...... 12

          2.    Technical Operation of the Wii System .......................... 13

    E.    Commission Proceedings ...................................................... 17

          1.    Initial Determination Found No Violation on
                Multiple Grounds ................................................... 17

          2.    Initial Commission Review and Remand ....................... 18

          3.    Commission Final Opinion Found No Violation
                Based on Invalidity, Noninfringement, and Lack of
                Domestic Industry ................................................... 19

IV.  SUMMARY OF ARGUMENT ......................................................... 20

    A.    The Commission Correctly Found Noninfringement Based
          on A Straightforward Reading of the Claims and
          Undisputed Technical Evidence ............................................. 20

# TABLE OF CONTENTS
## (continued)

Page

B.   The Asserted Claims Are Invalid Under Section 112
     Based on the Lack of Supporting Disclosure and
     Substantial Evidence That Undue Experimentation Would
     Be Required To Practice the Full Claim Scope ....................... 22

C.   The Commission Correctly Found That CK Failed To
     Prove Significant Investments Tied to the Asserted Patents .... 23

V.   STANDARD OF REVIEW ................................................................. 24

VI.  ARGUMENT ..................................................................................... 25

A.   The Commission Correctly Interpreted Claim 24 of the
     '742 Patent and Its Noninfringement Finding Is Supported
     by Substantial Evidence .......................................................... 25

     1.   The Commission Correctly Interpreted "Control or
          Activate" Based on Plain Meaning ................................. 26

     2.   Undisputed, Substantial Evidence Shows the Wii
          Remote Does Not "Control or Activate" Game
          Effects .......................................................................... 30

B.   The Commission Correctly Affirmed the CALJ's Finding
     of Noninfringement of Claim 7 of the '917 Patent .................. 33

     1.   The Commission Correctly Construed "Command" ...... 35

     2.   The Commission's Noninfringement Finding Is
          Supported by Substantial Evidence ............................... 36

C.   The Commission Correctly Concluded that the Asserted
     Claims Are Invalid For Lack of Enablement ........................... 37

     1.   The Specification Does Not Describe and Teaches
          Away From Practice of the Invention with
          Electronic Sensors .......................................................... 39

     2.   Substantial Evidence Supports the Commission's
          Finding That Undue Experimentation Would Be
          Required ......................................................................... 42

iv

# TABLE OF CONTENTS
## (continued)

|  |  |  |  | Page |
| --- | --- | --- | --- | --- |

3. The Commission Properly Rejected CK's Argument That the Prior Art Enables Its Claims .............................. 45

4. The Commission Took Into Account the Predictability of the Technology .................................... 48

D. The Commission Correctly Concluded That the Asserted Claims Are Invalid For Lack of Written Description ............... 50

1. CK Cannot Argue Obviousness To Compensate For Lack of Written Description ........................................ 52

2. The Commission Did Not Erroneously Rely on the Inventor Admissions That They Did Not Invent What They Claimed ....................................................... 55

E. The Commission Correctly Determined That CK Failed to Satisfy the Domestic Industry Requirement ............................. 56

1. The Commission Correctly Found That CK's MagiQuest Attraction Is Not an "Article Protected by the Patent" .................................................................. 59

2. None of CK's Alternative Theories Are Applicable ...... 61

a. The Toy Wands and MagiQuest Attraction Are Not A "Complete Article of Commerce" ...... 61

b. CK's Amusement Park Expenses Are Not "Value-Add" Activities ....................................... 63

VII. CONCLUSION ................................................................................. 64

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rule 28(d)(1)(B), material subject to a protective order entered by the United States International Trade Commission has been redacted from this brief. The redacted material on pages iii, 1, 11-17, 19-21, 29-32, and 34 reflects Nintendo's proprietary, technical information and was designated by Nintendo as confidential business information under the protective order. The redacted material on pages 5, 6, 58, and 62-64 was designated by Appellant Creative Kingdoms under the protective order.

# TABLE OF AUTHORITIES

## CASES

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
    228 F.3d 1338 (Fed. Cir. 2000) ................................................ 44

*Alza Corp. v. Andrx Pharm., LLC*,
    603 F.3d 935 (Fed. Cir. 2010) ................................................ 42

*Alza Corp. v. Andrx Pharm., LLC*,
    607 F. Supp. 2d 614 (D. Del. 2009), *aff'd*, 603 F.3d 935 (Fed.
    Cir. 2010) ............................................................................. 47

*Ariad Pharms., Inc. v. Eli Lilly Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) .............................................. 53

*Auto. Techs. Int'l. Inc. v. BMW of N. Am., Inc.*,
    501 F.3d 1274 (Fed. Cir. 2007) ...................................... passim

*Bilstad v. Wakalopulos*,
    386 F.3d 1116 (Fed. Cir. 2004) .............................................. 54

*Boston Scientific Corp. v. Johnson & Johnson*,
    679 F. Supp. 2d 539 (D. Del. 2010) ....................................... 56

*Cephalon, Inc. v. Watson Pharm., Inc.*,
    707 F. 3d 1330 (Fed. Cir. 2013) ...................................... 48, 56

*Certain Airtight Cast-Iron Stoves*,
    Inv. No. 337-TA-69 Comm'n Op. 0080 WL 594367 (Jan. 1.
    1981) .................................................................................... 63

*Certain Concealed Cabinet Hinges and Mounting Plates*,
    Inv. No. 337-TA-289, Comm'n Op. (Jan. 8, 1990) ................. 60

*Certain Digital Set-Top Boxes and Components Thereof*,
    Inv. No. 337-TA-712, Order No. 33, 2011 WL 334623 (Jan.
    11, 2011) ............................................................................. 63

*Certain Double-Sided Floppy Disk Drives*,
Inv. No. 337-TA-215, Comm'n Op., 227 U.S.P.Q. 982 (Oct. 15, 1985) ............................................................. 61

*Certain Dynamic Sequential Gradient Compression Devices and Component Parts Thereof*,
Inv. No. 337-TA-335, Initial Determination, (May 15, 1992) ................ 60

*Certain Kinesiotherapy Devices and Components Thereof,*
Inv. No. 337-TA-823, Comm'n Op. (July 12, 2013) .............................. 61

*Certain Printing and Imaging Devices and Components Thereof,*
Inv. No. 337-TA-690, Comm'n Op. (Feb. 17, 2011) .............................. 57

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)................................................................... 24

*Corning Glass Works v. ITC*,
799 F.2d 1559 (Fed. Cir. 1986) ............................................... 24

*Crocs, Inc. v. Int'l Trade Comm'n*,
598 F. 3d 1294 (Fed. Cir. 2010) .............................................. 59

*DSW, Inc. v. Shoe Pavilion, Inc.*,
537 F.3d 1342 (Fed. Cir. 2008) ............................................... 30

*Engel Indus., Inc. v. Lockformer Co.*,
946 F.2d 1528 (Fed. Cir. 1991) ............................................... 49

*Enzo Biochem, Inc. v. Calgene, Inc.*,
188 F.3d 1363 (Fed. Cir. 1999) ............................................... 48

*Fiers v. Revel*,
984 F.2d 1164 (Fed. Cir. 1993) ............................................... 51

*Finnigan Corp. v. ITC*,
180 F.3d 1354 (Fed. Cir. 1999) ............................................... 24

*GemStar-TV Guide Int'l, Inc. v. ITC*,
383 F.3d 1352 (Fed. Cir. 2004) ............................................... 24

*Genentech, Inc. v. Novo Nordisk A/S*,
  108 F.3d 1361 (Fed. Cir. 1997) ...................................................... 37, 38, 45

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
  381 F.3d 1142 (Fed. Cir. 2004) ........................................................ 23, 24

*Lear Auto. Dearborn, Inc. v. Johnson Controls, Inc.*,
  No. 04-73461, 2010 U.S. Dist. LEXIS 22619 (E.D. Mich.,
  Mar. 11, 2010) ....................................................................................... 35

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  481 F.3d 1371 (Fed. Cir. 2007) ........................................................ 41, 49

*LizardTech, Inc. v. Earth Res. Mapping Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ............................................................. 50

*Lockwood v. Am. Airlines, Inc.*,
  107 F.3d 1565 (Fed. Cir. 1997) ............................................................. 52

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
  687 F.3d 1377 (Fed. Cir. 2012) ............................................................. 52

*Martin v. Mayer*,
  823 F.2d 500 (Fed. Cir. 1987) ............................................................... 53

*Motorola Mobility, LLC v. ITC*,
  737 F.3d 1345 (Fed. Cir. 2013) ............................................................. 60

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
  424 F.3d 1161 (Fed. Cir. 2005) ............................................................. 55

*Pfizer v. Teva Pharm. USA, Inc.*,
   --- F. App'x ---, 2014 WL 463757 (Fed. Cir. Feb. 6, 2014) ................... 54

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................................. 21, 25, 34

*PowerOasis, Inc. v. T–Mobile USA, Inc.*,
  522 F.3d 1299 (Fed. Cir. 2008) ............................................................. 53

*Schaper Mfg. Co.* v. *ITC*,
    717 F.2d 1368 (Fed. Cir. 1983) .............................................................. 62

*Sitrick v. Dreamworks, LLC*,
    516 F.3d 993 (Fed. Cir. 2008) ........................................................ 37, 39

*Spectra-Physics, Inc. v. Coherent, Inc.*,
    827 F.2d 1524 (Fed. Cir. 1987) .............................................................. 49

*Streck, Inc. v. Research & Diagnostics Sys., Inc.*,
    655 F.3d 1269 (Fed. Cir. 2012) ....................................................... 44, 56

*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
    734 F.3d 1332 (Fed. Cir. 2013) ........................................... 23, 24, 50, 54

*Univ. of Rochester v. G.D. Searle & Co.*,
    358 F.3d 916 (Fed. Cir. 2004) ............................................................... 53

*Wyeth v. Abbott Labs.*,
    No. 08-230 & -1021, 2012 WL 175023 (D.N.J. Jan. 19, 2012).............. 56

*Zoltar Satellite Alarm Sys., Inc. v. Motorola, Inc.*,
    No. 06-44, 2007 WL 4557781 (N.D. Cal. Dec. 21, 2007) ...................... 35

## STATUTES

19 U.S.C. § 1337............................................................................................... 2

19 U.S.C. § 1337(a)(2)..................................................................................... 59

19 U.S.C. § 1337(a)(2)-(3)............................................................................... 24

35 U.S.C. §112 ................................................................................................... 1

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from this same Investigation was previously before this or any other appellate court.

*Creative Kingdoms, LLC*, *et al. v. Nintendo Co., Ltd.*, *et al.*, No. 11-cv-351-HU (D. Ore.), involves the same patents at issue in this appeal as well as other patents asserted in the original Complaint filed in Investigation No. 337-TA-770, and so may be affected by the Court's decision in this appeal. This district court case is stayed pursuant to 28 U.S.C. § 1659(a) pending conclusion of the Investigation and related appeals.

*Confidential Material Redacted*

## I.   STATEMENT OF THE ISSUES

1.     Did the U.S. International Trade Commission (the "Commission")
correctly determine that the Nintendo Wii Remote does not infringe claim 24 of the
'742 patent, where:  (a) claim 24 requires a handheld device that transmits signals
that "control or activate" play effects; (b) the handheld Wii Remote sends ███████

███, not signals that "control or activate" anything; and (c) the ███████████

███████████████████████████████████████████████████████████████████████

███████████████████, a system unlike any described in the '742 patent?

2.     Did the Commission correctly determine that the Wii Remote does not
infringe claim 7 of the '917 patent because it does not send "commands" that
"control" play effects, given the facts set forth with respect to issue 1?

3.     Did the Commission correctly find the asserted claims invalid under
35 U.S.C. §112 for lack of enablement and lack of written description, where:  (a)
at CK's[2] request, the Commission construed the motion sensor limitations broadly
to encompass both mechanical and electronic sensors; (b) the specification
discloses only simple embodiments that use mechanical ball-tilt on/off switches;
(c) the undisputed, unrebutted evidence showed that electronic sensors such as
accelerometers and gyroscopes operate in a fundamentally different and more
complex way than the ball-tilt switches described in the patents; and (d) Nintendo

---

[2] "CK" refers to Appellants Creative Kingdoms, LLC and New Kingdoms, LLC.

presented substantial and unrebutted evidence, including live testimony from multiple fact witnesses, establishing that undue experimentation would be required to practice the claims using electronic sensors?

4.     Did the Commission correctly determine that CK failed to satisfy the economic prong of the domestic industry requirement, where CK's domestic industry evidence addressed ***unpatented*** amusement park attractions, and did not identify significant expenses related to the patented technology, *e.g.*, toy wands or game effects with which the wands interact?

## II.     STATEMENT OF THE CASE

CK filed a complaint under 19 U.S.C. § 1337 against Nintendo seeking to ban imports of the Wii video game system.  CK alleges that the Wii infringes two patents that describe "magic wands" that use mechanical ball tilt on/off switches to activate "effects" (such as mechanical treasure chests) when the wand is moved in a certain manner.  The Wii is fundamentally different than CK's toy wand, the asserted claims, and what is enabled and described in the patents-in-suit.

The patents at issue were inspired by inventor Denise Weston's, CK's self-described "playologist," decision to incorporate a primitive plastic or wooden Harry Potter magic wand into CK's play structure and game play designs.  The patents describe a particular arrangement of two mechanical tilt switches in a wand, configured to create an "activation circuit" that would be triggered only

2

when the wand was motioned in a "particular manner." While the patents contained detailed disclosures of drawer knobs to decorate the wand, and even a lathe for machining the wood handles for the wand, they fail to describe how to make a wand that would collect and process data from sensors like the accelerometers or gyroscopes found in the accused products. Rather, CK only claimed the sending of specific commands and only described those commands as resulting from mechanical on/off switches. In fact, neither the inventors nor CK ever attempted to make a prototype with accelerometers and gyroscopes. Ms. Weston testified that she does not know what accelerometers and gyroscopes are, and the other co-inventor, patent attorney Jonathan Barney, testified that, even today, he did not know how to design a wand that would recognize gestures using an accelerometer.

The Commission concluded that the Wii system does not infringe either of the two claims on appeal because the Wii Remote does not control, activate, or command play effects. The Commission, the Chief Administrative Law Judge ("CALJ"), and the Commission Investigative Attorney ("IA") also concluded that the claims on appeal are invalid under Section 112 because (1) the claims sweep broadly to cover electronic sensors, such as the accelerometers and gyroscopes employed by the Wii Remote, (2) the patent does not describe or enable anything other than simple mechanical ball tilt on/off switches, and (3) the undisputed,

uncontradicted evidence established that practicing the claims using electronic sensors would have required undue experimentation. Finally, the Commission found that CK failed to meet the economic prong of the domestic industry requirement because it did not establish significant expenditures that relate to the patented technology.

Four independent grounds support the Commission's no-violation decision: (1) the Wii does not infringe either of the asserted claims; (2) the asserted claims are invalid for lack of enablement; (3) the asserted claims are invalid for lack of written description; and (4) CK failed to satisfy the economic prong of the domestic industry requirement. CK fails to show any error in the Commission's findings.

## III.  STATEMENT OF FACTS

### A.    Nintendo

The Nintendo Respondents include Nintendo Co., Ltd. ("NCL") and its wholly owned subsidiary, Nintendo of America Inc. ("NOA"). NCL, a Japanese corporation headquartered in Kyoto, Japan, has been one of the world's most innovative video game companies for over three decades. NOA, a Washington corporation headquartered in Redmond, Washington, markets and sells the Wii system and other Nintendo products in the United States.

*Confidential Material Redacted*

### B. Creative Kingdoms and its Alleged Domestic Industry

CK operates a medieval-themed attraction in Myrtle Beach, South Carolina, called "MagiQuest." MagiQuest players use plastic toy devices, such as a wand or a compass, to interact with various physical "effects" (*e.g.,* treasure chests). Players learn to use the wand in a particular way to cast "spells" to activate effects. A1472 Q/A 36-38.

CK imports toy wands from a Hong Kong supplier, ████████████████. A12274-76; A12328-29. CK hired two part-time consultants to help develop the wand in 2004, the year before CK opened MagiQuest. A12323; A12273.

In an effort to meet the economic prong of section 337's domestic industry requirement, CK relied on the cost of designing, building, and operating the Myrtle Beach MagiQuest facility. The Myrtle Beach facility is not covered by the patents-in-suit, and has nonpatented retail stores, food stands, rides, business offices, and game space. A1304; A2025; A12220; A12222. The artists, actors, musicians, set designers, and costume designers that CK hired to create a medieval theme did not design or build the patented wands. A35; A1303-04. Similarly, the elaborate MagiQuest backdrops, such as faux castle walls, bridges, and other structures are not patented. A1087; A1124; A1126; A4429.

***Confidential Material Redacted***

The game effects in the MagiQuest play area have ███████████

████████████████████████████████████████████████████████████

███████████. A1475 Q/A 52. CK did not submit evidence of any

expenses specifically related to the wands, game effects, or associated electronics.

## C. The Patents

The '917 and '742 patents describe and claim toy magic wands that use mechanical ball tilt on/off switches. Both patents derive from a common application and, in all relevant respects, have an identical specification. CK Br. at 12.

Each of the asserted claims includes motion sensor limitations. A552 ('917, claim 6 recites "motion sensors configured to generate a [ ] signal in response to a [ ] motion"); A631 ('742, claim 24 recites an "arrangement of one or more sensors being arranged so as to generate a [ ] input signal responsive to at least [ ] motion"). Lead inventor Denise Weston, a self-described "playologist," has no expertise in motion sensors and does not understand how they work. A10556:22-A10557:3; A10560:10-17; A10563:10-A10564:2. Her patent attorney, Jonathan Barney, made a simple prototype wand using the ball tilt switches, and added himself as a co-inventor. A1322-23 Q/A 116-123; A1324 Q/A 132-36.

### 1. The Patents Describe Mechanical Tilt Switches, Not Electronic Sensors

The '917 and '742 patents describe a toy magic wand that includes a set of tilt switches that are in an ON state in one orientation and in an OFF state when tilted in a different orientation. *E.g.,* A537[7:60-8:55]. The tilt switches are configured in opposite directions. *E.g.*, A505[Fig. 1]. As a result, during normal handling, when the wand is not moving or held in a non-horizontal orientation (*e.g.*, with the tip up or down), gravity causes at least one of the ball tilt switches to be in an OFF state. *See* A507[Figs. 5A, 5B]; A537[8:5-60]; A538[9:1-9:19]. Because the switches are wired in series, if one of the switches is in an OFF state, the circuit is open and the wand does not transmit, as demonstrated in the following graphics.



A12261-63.

The specification explains that the claimed magic wand requires a particular "learned" movement—what CK calls the "Barney whip"—to activate and transmit a signal. A538[9:20-38, 9:53-58("successful operation of the wand 100 requires

real skill, patience and training")]; A3440-41 Q/A 174-181; A3442-43 Q/A 183-185; A3459-60 Q/A 220-222. When the wand is waved in this particular manner, not too vigorously and not too gently, the centrifugal force for the outer switch overcomes the impact of gravity, while the centrifugal force for the inner switch does not. Under that circumstance, both switches are "ON," causing the wand to transmit a command signal, as shown in A12627-29 below.



## 2. Each Switch State of the Wand Corresponds to a Preset Command

CK's patents describe a one-to-one relationship between a specific switch state and a unique command signal sent from the wand. A542[17:67-18:1]. For example, the two orthogonal switches 192 and 194 in figures 14A-B of the '917 patent will be in a preset ON/OFF state depending on the rotational orientation of the wand. *See* A10501:5-25. This predetermined state corresponds to a predetermined command signal, which dictates a command to a play effect such as turning a lamp on or off. A541[15:8-11]. For example, ON/ON corresponds to

1/1, OFF/OFF corresponds to 0/0, and so on. A10509:25-A10510:12; *see also* A541[15:55-59] (figures 15A-C show a rotary switch that "directly loads up to 4 data bits . . . representing specific desired commands"); A541[16:9-15] (figures 16A-C illustrate touch sensitive buttons that store data representing specific commands). And each of those combinations of values dictates that a particular associated action be performed. A10516:12-A10517:6.

For example, as shown in figure 23, the receiver compares the command signal to a "preselected coded value" stored in address storage 368. A547[27:56-60]. If address comparator 370 detects a match, this "produces a command termination signal which tells an associated controller 374 to process the received command signal(s) and to actuate one or more corresponding play effects . . . ." A547[27:63-66].



FIG. 23

A525.

In sum, the receiver functions as a look-up table that compares the bits of the preset, in-coming command signals from the wand against a table of possible commands stored in a control module. If the receiver finds a match, it activates the effect associated with the command. So even for embodiments with very large numbers of sensor states, a "unique command" is associated with each state. A10492:2-20.

### 3. The Patents Do Not Disclose Practicing the Claims With Electronic Sensors

CK drafted the claimed motion sensor limitations broadly to cover both mechanical and electronic sensors but the specification does not disclose anything about practicing the claims using electronic sensors. The specification contains only a single, long, aspirational sentence suggesting that the "wand activation circuitry" *could* be practiced "using a wide variety of other motion and/or tilt sensors and/or other supporting circuitry elements … includ[ing], without limitation, impact sensors, micro-sensors, gyro-sensors, force sensors, micro-switches, momentum sensors, gravity sensors, accelerometers, and all variety of reed switches (gravity, momentum, magnetic or otherwise)." A538[10:32-38].

However, CK's own expert—who CK contends to have greater than ordinary skill in the art—admitted that he did not fully understand the list and that some of the sensors could even be "mythical." A11334:8-10; 11334:17-22; 11336:14-11337:21; 11338:14-25; 11342:19-22; 11341:11-13; 11342:6-15;

11345:13-19; 11346:9-14.  CK's expert further admitted he did not know how to use any of these alternative sensors to make even a *single* device that meets the claim limitations, much less two devices connected together and independently movable, as the '742 patent requires.  *Id.*  In fact, the specification contains no disclosure of how to practice the claims using anything other than simple mechanical tilt switches.  For example, the specification does not describe how to use data from accelerometers and gyroscopes.  A3522-23 Q/A 470, 472-73.  To date, CK still has not launched its own wand with an accelerometer or a gyroscope.  A10277:20-A10278:8.

### D.    The Nintendo Wii

The accused Wii system products include the Wii Remote Plus (for ease of reference, referred to herein as the "Wii Remote"),[3] Wii Remote, Wii console (versions ▮▮▮▮▮▮▮) and Wii U console, and other Wii accessories.  A1.  The Wii system operates with a wide range of games, including games created by independent, third-party developers.

---

[3] The Wii Remote contains a three-axis accelerometer, while the Wii Remote Plus has a three-axis gyroscope in addition to a three-axis accelerometer.  A3004-5 Q/A 19-21.  The Wii Remote Plus is the equivalent of the Wii Remote paired together with the accused Wii MotionPlus accessory (which contains a two-axis gyroscope and a one-axis gyroscope).  *See id.*

### 1.   The █████████████████████ Wii's Operation

The Wii hardware (*i.e.*, Wii console and Wii Remote) provides an interface between the game user and a wide range of games.   The ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████. A4207 Q/A 81-82; A4211 Q/A 89; A4235 Q/A 150.  Different game applications ████████████████████ ████████████████████████████████████████████████████████ █████████████. A4212-18 Q/A 90-103.

The game software directs a complex, multi-stage process to ██████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████. *Id.*; A4225-26 Q/A 119, 121.  This process █████████████████████████████████████████ ████████████. *Id.*   Thus, the Wii system is a platform which allows game developers freedom and creativity to design games, and as a result, thousands of unique Wii games have become available to consumers.  A4265 Q/A 241; A3001 Q/A 9-11.

The Wii's popularity ███████████████████████████████████████ ████████████████████████████████████████████████████████ █████████.  For example, in Wii Fit: Jogging, a user can make a game character

Confidential Material Redacted

run in different directions by simply running in place. A3024 Q/A 85 ("If the user were required to make the same movements as in the game world, it would certainly not be an easily playable game.").

### 2. Technical Operation of the Wii System

The Wii operates using a complex communication protocol. First, ███████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████. A4207
Q/A 82; A4211-15 Q/A 89-94. The Wii Remote includes (1) a three-axis accelerometer, which determines acceleration along the x, y, and z axes, and (2) a three-axis gyroscope, which determines angular velocity in three axes (pitch, yaw, and roll). A4193 Q/A 48; A4200 A/Q 66.

After the game ██████████████████████████████, the Wii console
███████████████████████████████████████████████████████████████████
Bluetooth chip in the console, as shown by the dashed red line moving from right to left from the game in the demonstrative below. A4212 Q/A 90; A4214 Q/A 93; A12366.



." A10417:1-8. When the Bluetooth chip in the console processes the request, the console ███████████████████████████████████████████████████████████████████████. A4212 Q/A 91; A3242. When the console requests accelerometer or gyroscope sensor data, ███████████████████. A4207 Q/A 82. For example, this graph from a Wii technical manual shows acceleration forces detected by the Wii Remote:

*Confidential Material Redacted*



A4245 Q/A 177; A12367.

When the Wii console 

. A10425:20-22; *see also* A3099 Q/A 62; A3100 Q/A 67.

The game application

, including inaccuracy, noise and sensor drift inherent in the sensors, as well as the disparate impact of gravity on the accelerometers.

*Confidential Material Redacted*

A3016 Q/A 57; A3032-34 Q/A 109-14; A10658:6-A10659:20; A10432:12-19; A4216 Q/A 99. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████.

After the ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████. A4217 Q/A 101. The game applications use complex, customized techniques to ████████████████████████████████████. A4253 Q/A 206. For example, some games may ████████████████████████

████████████████████████████████████████████████

██████. A10913:10-19.

The ██████████████████████████████████████████████

████████████████. A4225 Q/A 118. New data streaming from the Wii Remote

██████████████████████████████████████. A10908:9-17. The ██████████

██████████████████████████████████████████████████

██████████████████████. A10912:22-A10913:9.

Ultimately, the game application ████████████████████████████████

██████. This design is a critical aspect of the Wii system because it allows developers wide latitude and creativity in developing games. Keizo Ohta, the Nintendo engineer who developed the Wii console software, testified to precisely

Confidential Material Redacted

this point: "███████████████████████████████████████

███████████████████." A10657:19-22.

**E.     Commission Proceedings**

**1.     Initial Determination Found No Violation on Multiple Grounds**

The Initial Determination ("ID") issued by Chief Administrative Law Judge Charles E. Bullock ("CALJ") found no violation of section 337 on multiple grounds:

- ***Noninfringement***.  The CALJ found, based on undisputed technical evidence, that the Nintendo Wii products do not infringe two of the three patents then at issue.  A172, 207.

- ***Invalidity under 35 U.S.C. § 112 for lack of enablement and for lack of written description***.  At CK's request, the CALJ construed the asserted claims to cover not only mechanical switches (such as the disclosed ball tilt switches) but also electronic sensors, such as the accelerometers and gyroscopes in the Wii Remote.  A211.  However, the claims are invalid because patents neither describe nor enable practice of the claims using electronic sensors.  A212.  The CALJ concluded (with agreement from the IA) that the evidence and live fact witness testimony proved that practice of the claims using

electronic sensors would require undue experimentation. A210; A214-18.

- ***Failure to satisfy the economic prong of the domestic industry requirement***. The CALJ analyzed the domestic industry claims (CK's broadest claims) and correctly concluded that they cover only a wand and not a game environment. A257-58. CK's alleged investments, however, relate generally to its MagiQuest amusement park attraction. A256-59. Because CK failed to submit evidence of specific expenses relating to its patented technology, the CALJ could not conclude that CK made significant relevant investments. A259.

### 2. Initial Commission Review and Remand

The Commission determined to review several issues, but first, remanded to the CALJ for additional findings on various issues, including (1) infringement of the asserted claim of the '917 patent based on the Commission's revised construction of the term "wand," and (2) the technical prong of domestic industry with respect to the '917 and '742 patents. A3-4.

On remand, the CALJ determined that the Wii Remote does not infringe the '917 patent because it is not a "wand" under the Commission's construction. A99. The CALJ concluded that CK satisfied the domestic industry technical prong by showing that its wand practices the '917 and '742 patents. A19, 36. The CALJ

18

**Confidential Material Redacted**

explained that CK's technical prong proof, which pertained to only the wand, supported the CALJ's conclusion that CK's claims covered only the wands and not a game environment. A107-08, 124. Thus, the CALJ had no reason to revise his prior economic prong analysis. *Id.*

### 3. Commission Final Opinion Found No Violation Based on Invalidity, Noninfringement, and Lack of Domestic Industry

The Commission's final opinion affirmed the finding of no violation based on all the grounds found by the CALJ in the ID,[4] as well as the Commission's conclusion that the Wii Remote does not infringe the '742 patent.[5]

The Commission correctly found that the Wii Remote does not infringe the asserted claim of the '742 patent because it does not "control or activate" play effects. A28-30. Similarly, the Commission found the Wii Remote does not infringe the asserted claim of the '917 patent because it does not send "commands" to control play effects. A15-17.

Undisputed technical evidence regarding the Wii system's operation compelled the Commission's noninfringement findings. Because the ▮▮▮

---

[4] The Commission reversed the CALJ's finding that the Wii Remote is not a "wand" as recited in claim 7 of the '917 patent, but affirmed that the Wii Remote does not infringe this claim because the Wii Remote does not send "commands" to "control" play effects.

[5] Before issuing its final opinion, the Commission solicited additional briefing regarding Section 112 invalidity, infringement, and domestic industry.

*Confidential Material Redacted*

████████████████████████████████████████████████ (*see*

section III(D) *supra*), the Wii system is the polar opposite of the mechanical wand

described and claimed in CK's patents, which the user moves in a particular way to

send a preprogrammed command signal that activates play effects. A17; A30;

A4278-92 Q/A 287-320; A4309-20 Q/A 376-408.

The Commission also correctly affirmed the CALJ's conclusion that, as

shown by the lack of supporting disclosure and the extensive evidence of a need

for undue experimentation, the '917 and '742 asserted claims are invalid for lack

of enablement and lack of written description. A34-46.

Finally, the Commission affirmed that CK failed to satisfy the economic

prong of the domestic industry requirement. A76. The Commission permitted CK

to rely on expenses loosely associated with the patented technology, *i.e.*, toy

wands, game effects that interact with the wands, and associated electronics. A66-

70. Because CK failed to identify significant, relevant expenditures, however, the

Commission could not reverse the CALJ's finding that CK failed to satisfy the

economic prong. A70-73.

## IV. SUMMARY OF ARGUMENT

### A. The Commission Correctly Found Noninfringement Based on A Straightforward Reading of the Claims and Undisputed Technical Evidence

The Commission and the CALJ correctly interpreted the claims based on the

active language the inventors chose, *i.e.*, "command" and "control," to describe

**Confidential Material Redacted**

how the claimed wand's signal triggers a play effect. CK now seeks to broaden its claims by reading out these narrow, active limitations, an approach precluded by *Phillips*. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("the claims themselves provide substantial guidance as to the meaning of particular claim terms").

Undisputed technical evidence proves that, under any reasonable interpretation of the claims, the Wii Remote does not infringe because it does not "control or activate" or "command" game effects. The Wii Remote has ███████

███████████████████████████████████████████. The Wii Remote ███████

███████████████████████████████████████.

The game software ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████. The Wii system ███████

███████████████████████████████████████████████████

███████████████, as well as enjoyable gaming experiences for Wii system users.

21

**B.** **The Asserted Claims Are Invalid Under Section 112 Based on the Lack of Supporting Disclosure and Substantial Evidence That Undue Experimentation Would Be Required To Practice the Full Claim Scope**

As the Commission correctly found, CK sought and obtained a claim scope that the inventors did not describe, enable, or possess. CK drafted generic "motion sensor" limitations in an effort to capture both electronic *and* mechanical sensors. *See* A34-35. The claimed motion sensor limitations require, for example: (1) the wand must contain configurations of different types of sensors, *e.g.*, accelerometers and gyroscopes; (2) the motion sensors must be programmed to detect and distinguish between at least two "particular," "learned" motions; and (3) for claim 24 of the '742 patent, different motion sensors that can each detect a distinct motion must reside in two detachable components, which modularly attach to form the claimed wand.

For support, CK relies on an aspirational laundry list of sensors (including accelerometers and gyroscopes) that could potentially be used to practice the claims. The laundry list is not an enabling disclosure of anything. To the contrary, (1) CK's expert admitted that he does not know what all the listed sensors are, or how one could practice the claims using electronic sensors, and (2) the inventors admitted that they did not know (and still do not know) how to practice their claims using electronic sensors. *E.g.*, A10556:22-A10557:3; A10560:10-17; A10563:10-A10564:2.

The CALJ also heard and credited days of live testimony from multiple witnesses working in the field at the relevant time, who explained that attempting to practice the claims using electronic sensors would require undue experimentation. A41. Thus, substantial evidence supports the Commission's finding that the claims are invalid for lack of enablement and lack of sufficient written description. *Synthes USA, LLC v. Spinal Kinetics, Inc.*, 734 F.3d 1332, 1341, 1345 (Fed. Cir. 2013) ("whether a patent satisfies the written description requirement is a question of fact," reviewed for substantial evidence); *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1149 (Fed. Cir. 2004) (this Court reviews the factual underpinnings of enablement for substantial evidence).

## C.  The Commission Correctly Found That CK Failed To Prove Significant Investments Tied to the Asserted Patents

The Commission correctly determined that CK did not meet its burden of proof regarding the economic prong of the domestic industry requirement. Although CK's claims cover only toy wands, the Commission permitted CK to rely broadly on expenses associated with what the Commission characterized as the patented technology, *i.e.*, toy wands that interact with play effects. CK did not identify significant investments related to the wands (which CK imports), game effects, associated electronics, or anything directly tied to the patented technology. CK also provided no record on which to identify if and how its expenses related to

its patents.  As a result, the Commission was "left to guess" whether and how CK's alleged expenditures related to the patented technology.  A72.

CK argues the Commission erred by not allowing CK to rely generally on expenses associated with its MagiQuest attraction.  But general amusement park business expenses, untethered to the patented toy wands, cannot satisfy the economic prong of section 337.  As the Commission correctly found, domestic industry investments must have a "relationship to the patented technology."  A67; 19 U.S.C. § 1337(a)(2)-(3).

## V.  STANDARD OF REVIEW

This Court reviews findings of fact, such as the Commission's determinations of non-infringement and invalidity for lack of sufficient written description, for substantial evidence.  *See Synthes*, 734 F.3d at 1341; *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1361-62 (Fed. Cir. 1999).  This Court reviews the Commission's conclusions of law *de novo*.  *GemStar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1360 (Fed. Cir. 2004).  Enablement is a matter of law, but the Court reviews the factual underpinnings of enablement, including undue experimentation, for substantial evidence.  *Koito Mfg. Co., Ltd.*, 381 F.3d at 1149.

In addition, this Court defers to the Commission's reasonable interpretation of section 337, applying a "substantial evidence" test.  *See Corning Glass Works v. ITC*, 799 F.2d 1559, 1565-66 (Fed. Cir. 1986).

## VI. ARGUMENT

### A. The Commission Correctly Interpreted Claim 24 of the '742 Patent and Its Noninfringement Finding Is Supported by Substantial Evidence

The Commission correctly found noninfringement of Claim 24 of the '742 patent based on the undisputed evidence and an interpretation of the term "activate or control"/"control or activate" according to its plain and ordinary meaning, consistent with the specification.

As the Commission concluded, the express requirement that the transmitted "wireless signal" contain "information" to "activate or control" a play effect, not just potentially meaningless data, indicates that this term "does not merely indicate the perspective of the user holding the base component, but refers also to the content of the signals being transmitted by the transmitter." A29; *see also Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."). This plain meaning was confirmed by the specification which conveyed the one-to-one relationship between a specific state of the wand's sensors and the wand's transmission of a unique command signal.

CK's proposed construction ignores the claim language, and would cover any data transmitted from an input device that is ultimately used, in any way, to create a play effect. The data would not actually have to activate or control any play effect which is antithetical to both the specification's teachings and the plain meaning of "control or activate."

25

As set forth below, the Wii Remote does not infringe under the Commission's proper construction. The Wii Remote does not control or activate play effects; rather, it sends data in response to requests sent from the console. The game application decides if, when, and how any sensor data gathered from the Wii Remote may ultimately be used in creating video game animations.

### 1. The Commission Correctly Interpreted "Control or Activate" Based on Plain Meaning

The Commission correctly interpreted "control or activate" based on its plain meaning within the context of the claim. Claim 24 recites a "motion-sensitive input device" comprising, *inter alia*:

> [24e] an internal transmitter … configured to transmit a first wireless signal containing information based at least in part on said first motion of said elongated body to one or more external receiver devices to **activate or control** one or more play effects …

> [24h] wherein said base component is further sized, configured and adapted to enable the user to hold and manipulate said base component … in a particular manner to **control or activate** said one or more play effects …

A631[58:12-39] (emphasis added). The Commission found it "significant" that the "control" and "activate" language appeared in the portion of the claim language describing the transmitted signal. A29. A meaning that merely took into account the perception of the user holding the handheld device was deemed improper. *Id.* Rather, the claim language required that "control or active" carry with it a plain meaning referring to the content of signals transmitted.

26

The description in the specification confirmed this plain meaning of the claim language. As the Commission explained, in every disclosed embodiment, the wand sends the claimed "wireless signal" to directly "control or activate" play effects. Put another way, the specification describes a one-to-one correspondence between a specific state of the wand's sensors and a unique command and corresponding action. *E.g.,* A541[15:39-43, 16:43-45]. Based on the orientation or "sensor state" of the wand, the wand sends commands consisting of preset data strings to the receiver. The data string transmitted by the wand corresponds to a predetermined command signal. A542[17:67-18:1]; A541[15:55-59, 16:9-15]. The receiver serves as a look-up table, comparing incoming data against a table of expected commands stored in the receiver control module. *E.g.,* A547[27:56-60]. The receiver then executes a particular action associated with the command string. For example, the receiver could activate the game effect by turning a lamp "on" or "off." *E.g.,* A547[27:63-66].

CK's expert, Dr. Vojcic, agreed that in all embodiments, each possible sensor state of the wand corresponds to a "unique command." A10492:2-25. For example, in both embodiments CK cites (figures 23A and 24), the wand's "command signals" have a pre-determined outcome that the receiver looks up and executes. A617-18[30:38-31:2, 32:19-41]. The receiver has no discretion to simply ignore a properly issued command.

CK argues that the Commission's interpretation of "control or activate" implicitly imports two limitations:  (1) that the transmitted wireless signal "directly" "activate or control" play effects; (2) "without intervening processing." CK mischaracterizes the Commission's analysis.

First, the Commission did not import "directly" as a limitation of the claim. The Commission used "directly" to explain the specification's teachings of how the transmitted signal "controls or activates" play effects, as described above. A29.  CK argues that in some embodiments, the receiver look-up table may compare both the wand's signal and additional information (such as the player's "level" in the game) against preset values before activating a play effect. CK Br. at 31.  But there as well, the wand's signal dictates a predetermined outcome.  A617-18[30:54-31:2].  Regardless of additional data that may be programmed into the look-up table, the wand must, and does, in every disclosed embodiment, "control or activate" the play effect *as a result* of transmitting a command signal.[6]

A comparison of the CK wand to the Wii system further highlights the direct manner in which the wand signal controls or activates play effects.  The receiver

---

[6] The Commission also did not "mischaracterize" Figure 17C as CK claims.  Figure 17C shows that a user can directly "control or activate" an effect with the wand by (1) tapping the play effect with the magnetic tip 216 of the wand, thereby activating the effect's receiver circuitry so it is ready to receive command signals, and (2) "cast a spell" transmitting a command signal to trigger the play effect. A612[19:7-23 (the wand allows *users* to "maintain *direct* and precise *control* over any number of individual effects") (emphasis added)].

*Confidential Material Redacted*

described in CK's patents cannot request, transform, or selectively use data sent from the handheld device.  The ███████████████████████████ has all those capabilities.  As detailed in section III(D) *supra*, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

CK further argues that the Commission interpreted claim 24 to require that the signal "activate or control" a play effect "without intervening processing." However, the phrase "intervening processing" appears nowhere in the Commission's opinion.  Nor does the phrase appear in the patent or in any constructions proposed below.  In fact, the Commission acknowledged that the receiver may "process[ ] command signals," but correctly concluded that any such processing is a ***predetermined execution*** of the wand's signal.  A30.

Thus, the Commission did not interpret the claims to exclude processing of the wand's signal; rather, the Commission properly focused on whether the signal controls the play effect.  To draw a contrast between the claimed wand signal and the Wii Remote, the Commission noted that the Wii Remote sends "raw data," *i.e.,* data that does not activate a game effect.  In other words, "raw data" refers to the lack of a causal relationship between the data and the activation of a game effect, not to the extent to which data must be processed.

In sum, the Commission applied a straightforward interpretation of the term "control or activate." CK's proposed construction would read out "control or activate" and cover *any* input device that transmits *any* data that is in *any* way used in the creation of a play effect. Neither the claims nor the specification permits CK's expansive reading, particularly given the specification's detailed teachings regarding the one-to-one correspondence between a sensor state and a preset command. *See, e.g.,* A10516:12-A10517:6; *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008) ("plain and unambiguous claim language controls the construction analysis").

## 2. Undisputed, Substantial Evidence Shows the Wii Remote Does Not "Control or Activate" Game Effects

Having correctly interpreted the "control or activate" requirement, the Commission necessarily found that the Wii Remote does not infringe claim 24 because it does not transmit a signal that "control[s] or activates[s]" a play effect. The Commission's non-infringement determination rests on detailed factual findings supported by substantial and undisputed evidence. *See* A30.

Simply put, the Wii system operates in a fundamentally different manner than the claimed wand. The wand transmits a command signal to "control or activate" play effects in response to a particular learned motion. The Wii Remote does not control or activate video game animations. Rather, the game application and other software operating on the Wii console (1) ████████████████

███████████████████████████████████████████, and then (2)

███████████████████████████████████████████████

█████████.  *See* section III(D) *supra*.  The data from the Wii Remote does

not necessarily result in any particular action or game effect.

In the Wii system, the process begins with ███████████████

███████████████████████████████  A4207  Q/A  82;

A4211-15 Q/A 89-94. ███████████████████████

███████████████████████  A4212  Q/A  91;  A3242;

A10417:1-8. ███████████████████████████

███████████████████████████████████

███████████████████  A3099 Q/A 62; A3100 Q/A 67.

███████████████████████████████████

██████████████████  A3016 Q/A 57; A3032-34

Q/A 109-14; A10658:6-A10659:20; A10432:12-19; A4216 Q/A 99.

████████████████████████████  A4225 Q/A

118; A10908:9-17. ███████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████  A4253 Q/A 206;

A10913:10-19. █████████████████████████

████████████████████████████████████████████████████

A10912:22-A10913:9.

Thus, the raw data sent from the Wii Remote does not activate or control play effects. Nintendo intentionally designed the Wii system in this way to provide a flexible platform for developers, and this design has been integral to the Wii's popularity. *See* section III(D) *supra*.

To argue infringement, CK erroneously claims that if raw sensor data sent from the Wii Remote "meets some required criteria" provided by the game software, "corresponding play effects are triggered." CK Br. at 33. As detailed above, however, ████████████████████████████████████████

████████████████████████████. CK cites no evidence to indicate that Wii game effects activate based on a comparison of sensor data sent from the Wii Remote against criteria preset by the game software. To the contrary, CK's source code expert testified that the airplane game (the only game source code CK reviewed out of thousands of Wii games) ███████████████████████████

████████████████████████████████████████████████████

██████████

When input is received from the player … ████████████████

A3111-12 Q/A 99; A3115 Q/A 114.  CK also acknowledges elsewhere that the console "software layers," not the data packets sent by the Wii Remote, "trigger visual effects on a television screen."  CK Br. at 23.

CK, unable to rely on its source code expert's testimony, argues infringement based on "a user's perspective" of how the Wii operates.  *Id.* at 33-34.  But the "control or activate" limitations do not apply merely to the user's perception.  *See* section VI(A)(1) *supra*.  That an animated airplane may "appear" to turn right and left based on the user's movement of the Wii Remote does not prove infringement because the Wii Remote does not control or activate the animation.

The Commission's detailed factual findings regarding the technical operation of the Wii system provide substantial evidence to support the Commission's determination that the Wii does not infringe claim 24.

### B.    The Commission Correctly Affirmed the CALJ's Finding of Noninfringement of Claim 7 of the '917 Patent

Claim 7 of the '917 patent requires the claimed "toy wand" to include:

> a transmitter … configured to send to the at least one receiver a first ***command to control*** a first play effect based on the first signal, [and] to send a second ***command*** to the at least one receiver ***to control*** a second play effect based on the second signal.

A552[38:1-9] (emphasis added).   The Commission affirmed the CALJ's construction of "command" as "a signal that orders or dictates that a specific action

**Confidential Material Redacted**

be taken." A199. As set forth by the CALJ, the term's plain meaning and the specification supports this construction. Every use of "command" in the specification refers to "an order or instruction that ***must*** be followed." A198 (emphasis in original).

Under any reasonable interpretation of "command," the Wii Remote does not infringe. The Wii Remote does not send anything that resembles a command; rather, it sends raw data ███████████████████ The game application ███████████████████████████████████████████████████████████ ███████████████████████████████.

CK argues that the Commission should have found infringement because, according to CK, the claimed "command" need not "itself control the play effects." CK Br. at 36. CK is wrong. The claim recites a "command … to control" play effects. CK is attempting to rewrite the active "command" limitation into a passive requirement that would cover "any type of information transmitted to the receiving device that ***can be used*** in the performance of a controlled operation." CK Br. at 35; *Phillips*, 415 F.3d at 1312 ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.").

### 1.    The Commission Correctly Construed "Command"

As the Commission correctly determined, "command" as used in claim 7 "does not cover data that does not itself control the play effect but is used as input in a subsequent process to control the play effect."  A17.  Multiple district courts have similarly rejected attempts such as CK's to rewrite the term "command" into mere input information or data.  *See Lear Auto. Dearborn, Inc. v. Johnson Controls, Inc.*, No. 04-73461, 2010 U.S. Dist. LEXIS 22619, at *22 (E.D. Mich., Mar. 11, 2010) (transmitting "information" is not the same as sending a command, which is "an order given" or "a word or phrase especially in a set form by which an order is given"); *Zoltar Satellite Alarm Sys., Inc. v. Motorola, Inc.*, No. 06-44, 2007 WL 4557781, at *8 (N.D. Cal. Dec. 21, 2007) (a "'command' is a certain type of signal—one that communicates an *instruction* to perform an operation rather than a *characteristic* upon which an operation may be performed.") (emphasis in original).

CK argues that the Commission erred in its construction based on the same "intervening processing" and "raw data" arguments CK makes with respect to the "control or activate" limitation of the '742 patent claim 24.  These arguments fail for the reasons discussed in section VI(A)(1) *supra.*  As noted above, the Commission did not interpret "command" to exclude any processing of the command signal by the receiver.  *See* A198 (citing example where a "command"

35

may be "interpreted … by the receive[r] module").  The Commission distinguished "raw data" from "command signals" based on the *control* the data exerts over play effects, not the degree to which a receiver may *process* the data.

More specifically, the Commission used the term "raw data" to describe data like that sent from the Wii Remote, which does not require that any particular game effect occur.  The Commission distinguished this kind of "raw data" from the command signals recited in claim 7, which trigger a specific, predetermined game effect, *e.g.*, turning a light on or off.

CK thus shows no error in the Commission's construction of "command."

## 2. The Commission's Noninfringement Finding Is Supported by Substantial Evidence

CK acknowledges that its infringement argument is "entirely one of claim construction."  CK Br. at 35. CK's infringement argument therefore falls with its erroneous claim construction argument.

Further, the Commission's noninfringement finding is supported by the same undisputed evidence discussed in section III(D) *supra* regarding the technical operation of the Wii system, which demonstrates that the Wii Remote does not send "command[s] to control" game effects.

## C.   The Commission Correctly Concluded that the Asserted Claims Are Invalid For Lack of Enablement

The Commission correctly found the asserted claims invalid for lack of enablement based on the long-established rule that the specification "must teach those skilled in the art how to make and use the ***full scope*** of the claimed invention without 'undue experimentation.'"[7]   *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) (emphasis added).

CK drafted generic "motion sensor" limitations to encompass both electronic and mechanical sensors.   *See* A34-35.   Yet the inventors had no idea how to practice the claims using electronic sensors, much less describe or enable using them in the claimed invention.   *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008) (the enablement requirement is "part of the *quid pro quo* of the patent bargain.   A patentee who chooses broad claim language must make sure the broad claims are fully enabled ….") (internal citations omitted).

CK attempts to brush Section 112 aside, but practicing the claims using electronic sensors was neither straightforward nor trivial.   First, the claims require that the wand use ***different*** types of sensors to detect motion.   A552[claim 6 (reciting a "second motion sensor [ ] different than either of the pair of first motion sensors")]; A631[claim 24 (reciting "a first arrangement of one or more sensors"

---

[7]This section jointly addresses the non-enablement of both asserted claims, as CK did.   CK Br. at 54.

and "second arrangement of one or more sensors")]. Yet the patents contain no guidance about how to use data from accelerometers and gyroscopes. Second, the motion sensors must detect "particular" motions that take practice and skill to learn, not simply moving right or moving left as CK claims. *E.g.*, A538[9:48-58]. In addition, '742 claim 24 requires different motion sensors that reside in detachable components. Claim 24 of the '742 patent thus poses twice the challenge of the '917 patent by requiring two independently movable components that can each detect a distinct motion (for example, when the user is holding one component in each hand), and which communicate using a single transmitter.

Lacking any supporting disclosures in the patents, CK relies entirely on the knowledge of one skilled in the art to enable its invention. CK Br. at 43-48. CK cannot demonstrate enablement based merely on its claim that electronic sensors were "well-known" in the art. *Genentech*, 108 F.3d at 1366 ("[i]t is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention.").

The CALJ heard and credited testimony from highly qualified witnesses proving that attempting to detect motions of a handheld device using accelerometers and gyroscopes required undue experimentation. The witnesses struggled with extensive programming, research, and development work to make the simplest devices—and did not even attempt to include all of the functionality

claimed in the patents.  Substantial evidence supported the Commission's finding that the patents failed to enable the full scope of the claimed invention.

### 1. The Specification Does Not Describe and Teaches Away From Practice of the Invention with Electronic Sensors

The specification's elaborate description of how to practice the invention using mechanical tilt switches illustrates the level of detail required to enable the invention.  *See* A39-40; *Sitrick*, 516 F.3d at 1000 ("[E]nablement analysis begins with the disclosure in the specification.").  For example, the patents include over nine figures and six columns of text to describe the construction and operation of the tilt switch embodiment.  *E.g.,* A505-08, A515[Figs. 2A, 2B, 3A, 3B, 5A, 5B, 6, 14A, 14B];  A537-38[7:60-10:31];  A541[15:35-67].    Yet, the specification discloses nothing about how to make the claimed device using electronic sensors. *See Auto. Techs. Int'l. Inc. v. BMW of N. Am., Inc.,* 501 F.3d 1274, 1284 (Fed. Cir. 2007) ("If such a disclosure is needed to enable making and using a mechanical side impact sensor, why is not a similar disclosure needed to enable making and using an electronic side impact sensor[?]").

The specification contains only a single sentence referring to electronic sensors, stating the ***possibility*** that such alternative sensors could be "selected and adapted" to the claimed invention.  *See* CK Br. at 40.  The specification provides no text, no figures, and no other disclosure of how to make a wand that can detect learned motions using electronic sensors.

Further, the disclosures regarding mechanical tilt switches shed no light on how to practice the invention using electronic sensors. As the CALJ and the Commission correctly recognized, electronic sensors operate in a manner fundamentally different, and far more complex, than the simple tilt switches disclosed in the specification. A33-34.

The disclosed tilt switches have only two possible states: "on" and "off." A user must move the wand into a particular orientation to move the switches into the "on" state and transmit a signal. In contrast, accelerometers and gyroscopes output a continuous stream of data regardless of whether or how a user moves the device. A10921:13-A10922:7. Accelerometer and gyroscope output data is continuously variable and reflects not only the user's movement of the device, but other forces such as gravity and drift. A3435 Q/A 148-51; A4199 Q/A 61-62; A4202 Q/A 70-71.

The specification also teaches away from electronic sensors that continuously output data. The claimed wand must not activate continuously, but *only* "when a user actively moves the wand 100 in such particular way as to impart different transient acceleration forces on the distal and proximal ends," *i.e.*, in response to a specific, "single learned wand motion." A538[9:20-25]; A542[17:67-18:1]; *see also, e.g.,* A541[16:49-50]; A538[9:49-58]. The specification emphasizes that "[m]ercury and micro-ball tilt switch sensors as

illustrated and described above are particularly preferred." A538[10:47-50]. This teaching away from the use of electronic sensors itself evidences that undue experimentation would be required to practice the full scope of the claims. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007).

This Court's decision in *Automotive Technologies*, a case the CALJ noted as "strikingly similar" to this one, supports the Commission's finding of non-enablement. A216. Here, as in *Automotive Technologies*, the asserted claims are invalid because the inventors: (1) claimed a category of "motion sensors" that includes both mechanical and electronic sensors; (2) disclosed in extensive detail practice of the invention with mechanical tilt switches; but (3) disclosed nothing about how to practice the claims with electronic sensors.[8] *See Auto. Techs.*, 501 F.3d at 1282-83.

CK cannot escape *Automotive Technologies* by asserting that the '742 patent has a point of novelty other than the motion-sensor limitations (*i.e.*, modularity).[9] The PTO relied on both the motion-sensor limitations and the "modularly attach" limitations to issue the '742 claims. *See* A43 (citing JX-08.805). CK cannot

---

[8] CK's specification provides far less relevant detail than the disclosure in *Automotive Technologies*. *Compare* A538[10:32-38] (suggesting that the "wand activation circuitry" could be practiced "using a wide variety of other motion and/or tilt sensors …") *with Auto. Techs.*, 501 F.3d at 1283-84 (specification included a figure and full paragraph pertaining to an electronic sensor).

[9] As to claim 7 of the '917 patent, however, CK makes no such argument.

enable the claims by describing only one of them. Under *Automotive Technologies*, the specification must supply all "novel aspects" of the claimed invention. *Auto. Techs.*, 501 F.3d at 1283-84.[10] The Commission correctly found CK's claims invalid for lack of enablement because substantial evidence showed that the disclosed tilt switch embodiment "does not permit one skilled in the art to make and use the invention as broadly as it was claimed," *i.e.*, with electronic sensors. *Id.* at 1285.

### 2. Substantial Evidence Supports the Commission's Finding That Undue Experimentation Would Be Required

Substantial evidence supports the Commission's finding that undue experimentation would be required to practice the asserted claims with electronic sensors. The Commission and the CALJ credited live, unrebutted testimony from multiple fact witnesses—including Mr. Holt[11] and Dr. Nakra—who testified based on their real-world experience trying to develop hand-held devices that use accelerometers to detect motion.

Mr. Holt, who has more than ordinary skill in the art, spent six months trying to develop a wand that detected motion using a two-axis accelerometer, but

---

[10] This Court has also applied *Automotive Technologies* in cases where, as here, a claim is alleged to contain multiple points of novelty. *E.g., Alza Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 939-40 (Fed. Cir. 2010).

[11] The Commission relied on Mr. Holt's testimony as a fact witness. *See* A31; A41 n.3.

found he could not "simply replace the tilt switches [ ] with accelerometers," because accelerometers "provide analog or proportional output" while tilt switches merely provide an "on or off" output. A3348-49 Q/A 34-36. Mr. Holt also found that he had to customize the wand programming for different models, and so he had to redo this experimentation each time he wanted to switch to a different accelerometer model. A3356 Q/A 73-74.

Similarly, Dr. Nakra found that programming an accelerometer to distinguish between a "first motion" and a "second motion" required extensive experimentation. Even after many months of effort, she and her team of MIT engineers found that they could not design software that could distinguish between different motions, as many different motions would result in similar output data and gravity had a dramatic and varying impact on the accelerometer readings. A11123:22-A11125:23; A11129:14-A11131:21.

CK offered nothing to rebut this factual testimony except a conclusory opinion from its expert, Dr. Vojcic. Dr. Vojcic asserted that one of skill could have practiced the claims using accelerometers and gyroscopes because those terms appear in a laundry list of "alternative" sensors. A12093 Q/A 455-56. Dr. Vojcic, however, also admitted that he did not fully understand the list and that some of the sensors could even be "mythical"—he did not know how to use them to make even a *single* device, much less two devices connected together and

43

independently movable, as the '742 patent requires. A11334:8-10; 111334:17-22; 1336:14-111337:21; 11338:14-25; 11342:19-22; 111341:11-13; 1342:6-15; 11345:13-19; 11346:9-14. And the inventors obviously had heard of accelerometers and gyroscopes, but admitted they did not and do not know how to use these sensors to practice their claims. *See* section VI(D)(2) *infra*.

The Commission and the CALJ properly credited Mr. Holt's and Dr. Nakra's testimony over the refuted assertions of CK's expert. CK argues that the Commission should have dismissed Mr. Holt and Dr. Nakra's testimony as "irrelevant" because their work occurred slightly before the filing date, but CK identifies no relevant intervening prior art between the time of their work and the filing date. CK also cites no law to support its assertion that evidence of undue experimentation that pre-dates the filing date must be discounted entirely. *Streck v. Research & Diagnostic Systems* did not, as CK asserts, hold that evidence of undue experimentation should be disregarded if the work occurred prior to the filing date; it rejected the defendant's mischaracterization of testimony as evidence of undue experimentation. CK Br. at 51; *Streck, Inc. v. Research & Diagnostics Sys., Inc.,* 655 F.3d 1269, 1290 (Fed. Cir. 2012). The other decision CK cites, *Ajinomoto*, merely recites that enablement is determined as of the filing date, a standard the Commission properly applied. CK Br. at 51; A36-37; *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345 (Fed. Cir. 2000).

CK also mischaracterizes the devices Mr. Holt and Dr. Nakra attempted to build.  The relevant aspects of the Holt and Nakra devices were less complex than the claimed wand because they used only one type of sensor, accelerometers. A3344-45 Q/A 12; A4161 Q/A 24-25.  They did not even attempt to create the claimed configuration of sensors using different types of electronic sensors (*e.g.,* accelerometers and gyroscopes) as the claims require.[12]  *Id.*; A3356 Q/A 75.  These witnesses also never attempted to create a device with two independently movable components that could each detect distinct motions, as claim 24 of the '742 patent requires.  It was too hard to do something much simpler.

The Commission properly determined, based on this evidence, that undue experimentation would be required to practice the claims using electronic sensors.

### 3.  The Commission Properly Rejected CK's Argument That the Prior Art Enables Its Claims

The Commission properly rejected CK's attempt to demonstrate enablement based on the prior art.  *Genentech*, 108 F.3d at 1365 (specification "must teach those skilled in the art how to make and use the full scope of the claimed invention ….").  CK does not dispute that the novel aspects of its claims include different types of motion sensors *and* the configuration and output of the motion sensors.

---

[12] CK also cannot discount Dr. Nakra's work on the basis that it was aimed at "gesture tracking."  That term is simply shorthand for the claim language that requires detection of "moving, shaking, twisting, waving or pointing … in a particular manner."  A631[claim 24]; A36-37; A46.

For example, claim 7 of the '917 patent requires, *inter alia*, "a pair of first motion sensors" and "a second motion sensor … different than either of the pair of first motion sensors," which are "configured to generate a [first/second] signal in response to a [first/second] motion" of the wand.[13] A552[37:3-11]. CK disputed any suggestion that the asserted claims were anticipated or obvious in light of the prior art, and prevailed on those issues. The Commission and CALJ found that the patents were not invalid in light of the prior art. A46-56; A100-02; A113-15.

Given its barren specification, and no longer having to rebut Nintendo's obviousness case on appeal, CK now proclaims the obviousness of its claims to argue enablement (although of course, CK disputed such arguments below). *See, e.g.*, A12467-81, A12515-17 (arguing prior art does not disclose elements such as a "pair of first motion sensors configured to generate a first signal in response to a first motion"). CK leans heavily on the principle that "a specification need not disclose what is well known in the art," but this is "merely a rule of supplementation, not a substitute for a basic enabling disclosure." *Auto. Techs.*, 501 F.3d at 1283 (internal quotations omitted). Here, CK improperly seeks to "augment the disclosure with swaths of knowledge" regarding practice of the claims with electronic sensors, which as detailed above, "operate according to

---

[13] Claim 24 of the '742 patent similarly requires a "first arrangement of one or more sensors" and a "second arrangement of one or more sensors" that can detect different motions and generate different input signals. A631[58:23-24].

mechanisms completely different from those discussed in the patent." *Alza Corp. v. Andrx Pharm., LLC*, 607 F. Supp. 2d 614, 654-55 (D. Del. 2009), *aff'd*, 603 F.3d 935 (Fed. Cir. 2010).

Not only is CK's argument legally defective, CK fails to show that the prior art teaches a person of skill how to practice the invention with electronic sensors. CK and its expert vigorously disputed below that either of CK's cited references, Sato and Goschy, disclose or render obvious the claimed motion sensor limitations. A12026-27Q/A 145, 153; A12108 Q/A 535-39; A12111 Q/A 549; *see also* A12143 Q/A 690. In post-hearing briefing, CK argued to the CALJ that "there is no disclosure [in Sato] that any 'pair' of these accelerometer sensors is configured to collectively generate 'a first signal in response to a first motion,' as this claim requires." A12517. These references similarly cannot cure the deficiencies of CK's specification.

In addition, as CK argued below, neither Sato nor Goschy discloses a "base" and "auxiliary" component, let alone two components with the required sensor configuration and functionality required by '742 claim 24. A12416.

CK also cites testimony from Nintendo's expert Dr. Polish, but at best, this testimony shows that those skilled in the art knew accelerometers and gyroscopes ***could*** be used in motion-sensitive game controllers. Specifically, Dr. Polish agreed (in the context of his obviousness analysis) that "the use of motion-sensitive

47

controllers using things like accelerometers and gyroscopes for handheld devices for gaming technology was well-known." A11270:13-18.

That one of skill would know this technology existed falls far short of enablement. CK's own non-obviousness arguments below prove this point. For example, both Sato and Goschy disclose using electronic sensors in gaming controllers to detect motion. (A3324[Fig. 13]; A3336[7:21-26]). Yet, as CK argued, these references do not disclose or render obvious CK's claimed motion sensor configuration.

Because the specification does not teach how to devise the claimed wand using electronic sensors, any awareness that electronic sensors could be used constitutes nothing more than an invitation to experiment. *See Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1374-75 (Fed. Cir. 1999).

### 4. The Commission Took Into Account the Predictability of the Technology

Contrary to CK's contention, the Commission made findings as to the predictability of the technology at issue, one of the eight *Wands* factors. CK Br. at 48. The Commission did so even though it was not required to do so. *See Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F. 3d 1330, 1336 (Fed. Cir. 2013) (*Wands* factors are "illustrative are not mandatory") (internal citation omitted).

The Commission correctly determined, based on the testimony of Mr. Holt and Dr. Nakra, that attempting to practice the claims using electronic sensors like

accelerometers and gyroscopes "would not be predictable." A41. The specification's teaching that mechanical tilt switches are "particularly preferred" because they are more "reliable" than electronic sensors supports the Commission's finding. *See* A538[10:50].

Because Nintendo proved that attempts to practice the claimed invention with accelerometers and gyroscopes did not yield "predictable" results, CK cannot rely on *Spectra-Physics* and *Engel Industries*. *See Liebel-Flarsheim*, 481 F.3d at 1379-80 (reliance on *Spectra-Physics* "misplaced" because the "disclosure of an injector system with a pressure jacket does not permit one skilled in the art to make and use the invention as broadly as it was claimed, including without a pressure jacket"); *Auto. Techs.*, 501 F.3d at 1285 (rejecting the argument "that because the specification enables one mode of practicing the invention, viz., mechanical side impact sensors, the enablement requirement is satisfied"). *Spectra-Physics* and *Engel Industries* addressed the best mode requirement for mechanical claims, and noted in *dicta* that disclosure of a "single embodiment" or "any mode" of making and using the invention could, in certain cases, demonstrate enablement. *See Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1533 (Fed. Cir. 1991); *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987). However, these decisions do not address the electrical arts at all, let alone suggest that

electrical arts should be considered *per se* "predictable" for purposes of enablement as CK argues.

In sum, the Commission properly applied *Wands* to analyze the many factual considerations underlying enablement.  *See* A33.  CK has shown no error in the Commission's enablement analysis, and more than substantial evidence supports the Commission's factual findings.

### D.    The Commission Correctly Concluded That the Asserted Claims Are Invalid For Lack of Written Description

The Commission correctly found the asserted claims invalid for lack of sufficient written description because the specification does not "convey[] to those skilled in the art that the inventor had possession of the claimed subject matter at the time of the application."  A45 (citing *LizardTech, Inc. v. Earth Res. Mapping Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005)).  To satisfy paragraph one of Section 112, the written description must "allow[ ] a person of skill in the art to recognize that the patentee invented what is claimed."  *Synthes*, 734 F.3d at 1341.  Whether a patent satisfies the written description requirement is a question of fact.  *Id.*

The patentees drafted the "motion sensor" limitations of the asserted claims generically to cover both mechanical and electronic sensors.  *See* A34-35.  The written description therefore must convey to a person of skill in the art that the patentees invented and had possession of a wand that could detect and recognize

distinct "learned" motions, and fulfill all the motion sensor claim requirements, using different types of electronic sensors in the claimed configuration.

The specification, however, does not convey that the patentees knew how to detect motion using anything other than mechanical tilt switches. As the CALJ noted, the only disclosure of accelerometers and gyroscopes is a "'bare reference' to a laundry list of electronic sensors." A218 (quoting *Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed. Cir. 1993)). This "laundry list" purports to include not only accelerometers and gyroscopes, but also "impact sensors, micro-sensors, gyro-sensors, force sensors, micro-switches, momentum sensors, gravity sensors, accelerometers, and all variety of reed switches (gravity, momentum, magnetic or otherwise)." A538[10:32-42].

The lack of disclosure is not surprising given the inventors' admissions that they have no idea how to make a wand that employs electronic sensors to practice the claims. *See* section VI(D)(2) *infra*. CK cannot "preempt the future before it has arrived" by including a laundry list of every sensor that inventor and prosecuting attorney Jonathan Barney could imagine. *See Fiers*, 984 F.2d at 1171. Overwhelming evidence established that a person of ordinary skill in the art would not have recognized that the inventors had possession of the claimed wand that employed any of the listed "alternative" electronic sensors to detect and recognize distinct motions. As discussed above, CK's own expert—who CK contends to

have greater than ordinary skill in the art—could not explain what all the "alternative" sensors are, whether they were commercially available as of the filing date or might instead be "mythical," or how they could be used to practice the asserted claims. A218; A11334:8-10; 11334:17-22; 11336:14-11337:21; 1338:14-25; 111342:19-22; 11341:11-13; 1342:6-15; 111345:13-19; 11346:9-14.

As the Commission correctly recognized, this is a classic case of "overbroad claiming … attempt[ing] to cover more than was actually invented." *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012).

### 1. CK Cannot Argue Obviousness To Compensate For Lack of Written Description

As with enablement, CK argues that the knowledge of those skilled in the art cures the specification's lack of disclosure. CK essentially argues that it would have been obvious to practice the motion sensor limitations using sensors other than the disclosed tilt switches, and so the invention is sufficiently described.

CK cannot overcome its written description deficiencies by arguing its claims are obvious. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997) ("entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed."). A written description analysis considers not whether one of skill could have "construct[ed]" the claimed wand using electronic sensors, but "whether the application necessarily discloses that particular [invention].'" *PowerOasis, Inc. v. T–Mobile USA, Inc.*,

522 F.3d 1299, 1306-07 (Fed. Cir. 2008) (quoting *Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987)).

The specification, undisputedly, does not describe any handheld device that uses accelerometers or gyroscopes to detect motion. To the contrary, it teaches away from electronic sensors that output a continuous stream of data. *See* section VI(C)(1) *supra*. Accelerometers or gyroscopes are not described, but merely included in a laundry list of alternative sensors. That passing disclosure, at best, "amount[s] to no more than a 'wish' or 'plan'" for obtaining an embodiment of the claimed wand that employs electronic sensors, rather than a *description* of such a wand. *See Ariad Pharms., Inc. v. Eli Lilly Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010) (internal quotations omitted). Allowing such aspirational language to capture a broader claim scope would vitiate the core purpose of the written description requirement. *See Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004) (written description requirement exists "to ensure that the scope of the right to exclude … does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.") (internal quotation omitted).

Furthermore, the tilt switch embodiment does not sufficiently describe a genus of motion sensors that includes accelerometers and gyroscopes because, as detailed *supra* in section VI(C)(1), electronic sensors operate in a fundamentally

different way.[14] *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004); *see also Auto. Techs.*, 501 F.3d at 1285 ("Electronic side impact sensors are not just another known species of a genus consisting of sensors, but are a distinctly different sensor ….").

This Court's decision in *Synthes* is directly on point. *Synthes* affirmed that disclosure of a single species, "peripheral grooves," of the claimed "opening" did not sufficiently describe "*all* openings that may be used." *Synthes,* 734 F.3d at 1342 (emphasis in original). Factual testimony established that moving from the disclosed peripheral groves to the "internal slot" openings of the accused products was fraught with technical hurdles and took months of development. This testimony "provided ample evidence" of a lack of sufficient written description. *Id.* at 1343.

The CALJ heard equivalent live testimony in this case from Mr. Holt. Mr. Holt testified that adapting a wand that used tilt switches to detect motion using an accelerometer required many months of difficult development and experimentation. *See* section VI(C)(2) *supra*. And Mr. Holt did not even try to

---

[14] CK relies on *Pfizer v. Teva Pharmaceuticals* to argue that an inventor need not be in possession of every species of a claimed genus, but *Pfizer* applied a standard specific to chemical compounds and irrelevant here. *See Pfizer v. Teva Pharm. USA, Inc.*, 555 F. App'x 961, 2014 WL 463757, *5 (Fed. Cir. Feb. 6, 2014).

make a wand with different types of electronic sensors, *i.e.,* accelerometer and gyroscopes, in the claimed configuration.

### 2. The Commission Did Not Erroneously Rely on the Inventor Admissions That They Did Not Invent What They Claimed

The written description requirement exists, in important part, to "prevent an applicant from later asserting that he invented that which he did not." *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 424 F.3d 1161, 1165 (Fed. Cir. 2005). Both inventors admitted at trial that this is exactly what they attempted to do. They drafted their claims broadly to capture devices employing any variety of electronic sensors when in fact, they did not, and still do not, know how to practice their claims using any electronic sensors. A10257:12-20; A10279:13-25; A10304:22-A10305:3. For example, lead inventor Weston testified that she does not know how an accelerometer or a gyroscope works or how tilt switches work, let alone how one could use electronic sensors or even the disclosed tilt switches to practice her claims. A10556:22-A10557:3; A10560:10-17; A10563:10-A10564:2. Ms. Weston simply could not identify or describe her alleged invention. A10574:5-18.

CK now embraces its inventors' admissions in attempt to show error. CK argues that the Commission erred because it acknowledged that the inventors admitted that they did not invent their claimed invention. CK Br. at 55-56. However, the Commission's analysis relied on the lack of disclosure in the specification, and not the inventor testimony as CK claims. *See* A46; A218-19;

A254-255. Noting that the inventors' admissions "confirm[ed]" that "the inventors were not in possession of the invention that is claimed" shows no legal error. *See* A46; *Boston Scientific Corp. v. Johnson & Johnson*, 679 F. Supp. 2d 539, 555 (D. Del. 2010) (noting that inventors' testimony confirmed patents were invalid for lack of written description, as "[l]ogically, the inventors could not have described a knowledge they did not possess"); *aff'd* 647 F.3d 1353, 1360 (Fed. Cir. 2011); *Wyeth v. Abbott Labs.*, No. 08-230 & -1021, 2012 WL 175023 (D.N.J. Jan. 19, 2012) (in finding patents invalid for lack of written description, noting that inventor testimony confirmed lack of possession), *aff'd* 720 F.3d 1380 (Fed. Cir. 2013). CK cites no authority to suggest otherwise.[15]

CK therefore shows no error in the Commission's determination that the patents are invalid for lack of written description, a finding supported by substantial evidence.

### E. The Commission Correctly Determined That CK Failed to Satisfy the Domestic Industry Requirement

The Commission undertook a detailed factual analysis and correctly determined that CK did not meet its burden of proof regarding the economic prong of the domestic industry requirement.

---

[15] The footnote CK points to in *Cephalon* states only that the inventor's testimony was irrelevant, and *Streck* simply faulted the defendant for "mischaracteriz[ing]" the testimony. *See Cephalon,* 707 F.3d at 1341; *Streck*, 665 F.3d at 1286.

While CK's claims are limited to toy wands, the Commission nonetheless permitted CK to broadly rely on expenses associated with what the Commission characterized as the patented technology, *i.e.*, toy wands that interact with play effects. During the petition phase of the Investigation, the Commission even elicited special briefing from the parties to give CK another opportunity to demonstrate substantial investments in the wands, game effects, associated electronics, or other items related to the patents. A14756-62 (Question 9).

Despite ample opportunity, CK failed to meet its burden. CK provided no record on which to identify if and how its expenses related to its patented technology. Instead, CK lumped together generalized business expenses, going back as far as 2005, associated with building and operating an elaborate amusement park attraction.

While the Commission does not employ "any rigid mathematical formula" to evaluate domestic industry, there must be some "evidence to substantiate the nature and significance of [complainant's] activities with respect to articles protected by the patent." *Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27, 30 (Feb. 17, 2011). Here, as the Commission noted, CK's vague documentation left the Commission "guess[ing]" as to what CK's alleged expenditures are and how they relate to the alleged patented technology. A72.

*Confidential Material Redacted*

The bulk of CK's alleged investments do not relate to its patents. For example, CK claims $8.1 million in "equipment" investments that include millions of dollars in 

*See id.*; A2025; A2030.

CK never identified significant investments related to the wands, game effects, associated electronics, or anything directly tied to the patented technology. When asked by the Commission to submit special briefing on this issue, CK identified █████████████████████████████████████████████

█████████████████████████████████████████████ A12611. CK also claimed "the equivalent" of a ████████████ employee from 2009-2011 doing unspecified research and development work, but failed to quantify the associated cost. A12611-12. As the CALJ correctly found, CK's alleged research and development costs represent only ██████—"a mere scintilla"—of CK's tens of millions of dollars in alleged MagiQuest expenditures. A260 (emphasis added).

The Commission did not err by requiring CK to demonstrate that its domestic industry investments have a "relationship to exploitation of the patented technology." A67. The statute does not permit CK to rely on general amusement park business expenses untethered to the patent-protected articles, the toy wands.

19 U.S.C. § 1337(a)(2) (requiring a domestic industry "relating to articles protected by the patent"). The Commission therefore correctly found that CK failed to satisfy the economic prong.

### 1. The Commission Correctly Found That CK's MagiQuest Attraction Is Not an "Article Protected by the Patent"

Following the plain language of the statute, this Court and the Commission have consistently required that to qualify under subsections 1337(a)(3)(A) and (B), investments must be directed to articles protected by the patent. Known as the "technical prong" requirement, this "requires proof that the patent claims cover the articles of manufacture that establish the domestic industry." *Crocs, Inc. v. ITC*, 598 F. 3d 1294, 1306-07 (Fed. Cir. 2010).

CK ignores the technical prong requirement, arguing that the Commission should have "defined the domestic industry to include the domestic production of the entire MagiQuest attraction." CK Br. at 62. However, the Commission permitted CK to rely on a broad array of expenses associated with game effects that interact with the wands and associated electronics, which would include the "reader devices" referenced in the claims. CK did not show significant investments linked to the patented technology, and instead maintained its reliance on aggregated lump sums documented only by vague line item entries.

The Commission did not err by requiring CK to establish some "relationship" between its expenses and the patented technology. *Crocs*, 598 at

1308. The "with respect to" language in subsection 1337(a)(3) does not, as CK suggests, give *carte blanche* to rely on any investments arguably related to the patented articles, no matter how attenuated. 19 U.S.C. 1337(a)(3); *Certain Dynamic Sequential Gradient Compression Devices and Component Parts Thereof*, Inv. No. 337-TA-335, Initial Determination, at 60 (May 15, 1992) ("Congress did not intend … that activities of a complainant which generally relate to the subject area of the patent fall within the statutory definition of a domestic industry."); *see also Certain Concealed Cabinet Hinges and Mounting Plates*, Inv. No. 337-TA-289, Comm'n Op., at 23 (Jan. 8, 1990) ("Because of its indirect bearing on the patented features of the [product], we reduce the weight we otherwise would accord complainant's investment.").

CK's expansive statutory interpretation is also not, as it claims, sanctioned by *Motorola Mobility*, which allowed a patentee to rely on investments in operating system software for its patent-protected mobile phones. *Motorola Mobility, LLC v. ITC*, 737 F.3d 1345, 1351 (Fed. Cir. 2013). Because the claims required the software, and the software was a "significant component[], specifically tailored" for the phones, the software investments qualified under the "complete article of commerce" doctrine, which permits reliance on investments in essential components of a patent-protected article. *See* section VI(E)(2)(a) *infra*.

CK's claims, on the other hand, do not require the elaborate game environment CK seeks to rely on as its domestic industry.  A63.

The Commission therefore did not err by determining that CK's MagiQuest attractions are not "articles protected by the patent."

### 2.      None of CK's Alternative Theories Are Applicable

CK's amusement park business activities do not qualify under the "complete article of commerce" doctrine or any other exception to the general rule that, under subsections 1337(a)(3)(A)-(B), domestic industry investments must pertain to a patented article.

### a.      The Toy Wands and MagiQuest Attraction Are Not A "Complete Article of Commerce"

The Commission developed the "complete article of commerce" doctrine to permit reliance on domestic assembly or processing of a patented component, which is not itself saleable, into a "finished article of commerce."  *Certain Double-Sided Floppy Disk Drives*, Inv. No. 337-TA-215, Comm'n Op., 227 U.S.P.Q. 982, 989 (Oct. 15, 1985).  CK cites no authority applying this doctrine to anything other than U.S. manufacturing/assembly activities that integrate a patented component into a finished consumer product.  *See* CK Br. at 64 (citing *Certain Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, Comm'n Op., at 34 (July 12, 2013) (permitting reliance on U.S. manufacturing of a finished product from imported patented components)).

*Confidential Material Redacted*

CK's amusement park and toy wands do not fit into this framework. CK does not assemble or process the toy wands in the United States; it sells them exactly as imported from Hong Kong as a stand-alone item. In addition, most of the MagiQuest attraction "is far removed" from the patented technology (for example, the rides, retail shops, food stands, and other typical amusement park features). A67.

CK argues that the doctrine should nevertheless apply because the elaborate attraction is necessary to "entice players to buy the CK wand in the first place."[16] CK Br. at 64. But money spent to promote sales of the patented article is advertising, not a domestic industry investment. *Schaper Mfg. Co.* v. *ITC*, 717 F.2d 1368, 1373 (Fed. Cir. 1983) (rejecting reliance on "very large expenditures for advertising and promotion").

The Commission also correctly found that CK did not prove that the "'realities of the marketplace' require an elaborate amusement park attraction in order to use or sell its toy magic wand product." A68. In fact, ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[16] CK similarly argues it received investments "based entirely on the patented technology," but offered no proof that anyone invested money in CK based on its patents, except for perhaps the inventors. *See* A75-76.

███. *See* A1341-42 Q/A 20-31; A12190 Q/A 10; A12191 Q/A 19-24; A1311 Q/A 39.

### b. CK's Amusement Park Expenses Are Not "Value-Add" Activities

CK also cannot rely on its amusement park expenses under a "value-add" theory. While the Commission has, in a few exceptional cases, permitted reliance on domestic building of infrastructure, service, and repair activities directed to the patent-protected products, CK does not claim any activities of this nature.

CK's amusement park business expenses are simply too far afield from the patents to qualify as a domestic industry investment under the "value-add" principle employed in *Cast-Iron Stoves* and *Set-Top Boxes*. *See Certain Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69 Comm'n Op. 0080 WL 594367 (Jan. 1. 1981) (permitting reliance on technician repair and testing of the domestic industry products). In particular, the domestic industry in *Set-Top Boxes* was based on technical research and development efforts under subsection 337(a)(3)(C). *See Certain Digital Set-Top Boxes and Components Thereof*, Inv. No. 337-TA-712, Order No. 33, 2011 WL 334623, at *6-8 (Jan. 11, 2011). CK does not contend that any of its amusement park employees' work qualifies as research and development and does not rely on subsection 1337(a)(3)(C) on appeal.

CK claims some employees spend a minority of their time on "training activities, operation, and maintenance of the game" (CK Br. at 66), but it left the

Commission to guess as to if and how these activities specifically pertain to the wands and/or game effects. A72. CK's alleged "value-add" labor cost is also insignificant compared to CK's overall costs related to the MagiQuest game.[17] (*Compare* CK Br. at 67 (alleging $1 million in allocated "value-add" labor costs) *with* CK Br. at 57 (alleging nearly $12 million in MagiQuest costs).)

Given the factual and legal deficiencies in CK's domestic industry case, as extensively analyzed by the Commission, this Court should affirm that CK failed to satisfy the economic prong of the domestic industry requirement.

## VII. CONCLUSION

For these reasons, this Court should affirm the Commission's Final Determination.

---

[17] These labor costs also go back to 2006 with ██████████████████████. A1351-54 Q/A 80-100.

Respectfully submitted,

*/s/ Stephen R. Smith*
Stephen R. Smith
Cooley LLP
11951 Freedom Drive
Reston, VA 20190
Telephone: (703)456-8000
Facsimile: (703) 456-8100.

Thomas J. Friel, Jr.
Cooley LLP
101 California Street
5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

*Attorneys for Intervenors*
*Nintendo Co., Ltd. and Nintendo of*
*America Inc.*

Stephen C. Neal
Timothy S. Teter
Matthew J. Brigham
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000
Facsimile: (650) 857-0663

65

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

*United States International Trade Commission*, 2014-1072

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being

over the age of 18, upon my oath depose and say that:

Counsel Press was retained by Cᴏᴏʟᴇʏ LLP, Attorneys for Appellant to

print this document. I am an employee of Counsel Press.

On **June 27, 2014** counsel for Appellant has authorized me to

electronically file the foregoing **BRIEF FOR INTERVENORS**

**(confidential and non-confidential versions)** with the Clerk of Court using

the CM/ECF System, which will serve via e-mail notice of such filing to all

counsel registered as CM/ECF users, including any of the following:

| | |
|---|---|
| James R. Barney | Jia Chen |
| *(Principal Attorney)* | *(Principal Attorney)* |
| Elizabeth D. Ferrill | *Wayne W. Herrington* |
| Laurence M. Sandell | International Trade Commission |
| Finnegan, Henderson, Farabow, Garrett | Office of the General Counsel |
| & Dunner, LLP | 500 E Street, S.W., Suite 614 |
| 901 New York Avenue, N.W. | Washington, DC 20436 |
| Washington, DC 20001 | 202-708-4737 |
| 202-408-4000 | jia.chen@usitc.gov |
| james.barney@finnegan.com | wayne.herrington@usitc.gov |
| elizabeth.ferrill@finnegan.com | Counsel for Appellees |
| larry.sandell@finnegan.com | |
| *Counsel for Appellants* | |

Confidential copies will also be emailed to the above counsel and 2 paper copies will be mailed to the above principal counsel on this date.

   Upon acceptance by the Court of the e-filed document, six confidential paper copies will be filed with the Court within the time provided in the Court's rules.

June 27, 2014                                                          /s/ Robyn Cocho____
                                                                        Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

    X   The brief contains 13,983 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

    X   The brief has been prepared in a proportionally spaced typeface using  MS Word 2014  in a ___ point _____ font or

_____ The brief has been prepared in a monospaced typeface using ___ _____ in a ___ characters per inch_____ font.

June 27, 2014                         */s/ Stephen R. Smith*_____
                                      Stephen R. Smith, Esq.
                                      Cooley LLP
                                      *Attorneys for Intervenors*
                                      *Nintendo Co. Ltd. and Nintendo*
                                      *of America Inc.*